IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| ALAN P. WOODRUFF, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CV-330 |
| | ) | |
| NATIONAL LIFE INSURANCE COMPANY, | ) | |
| A Vermont Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court tried this civil action without a jury on October 30, 2006. Prior to trial, the plaintiff, Alan Woodruff ("Woodruff"), filed proposed and amended proposed findings of fact and conclusion of law [docs. 40, 41], and defendant, National life Insurance Company ("National Life"), also filed proposed findings of fact and conclusions of law [doc. 43]. After trial, plaintiff filed a second amended proposed findings of fact and conclusions of law [doc. 47], a post trial memorandum [doc. 48], and was given permission to file a supplemental post trial memorandum [doc. 50]. Having heard the testimony at trial and having reviewed the exhibits introduced into evidence at trial, the following are the court's findings of fact and conclusions of law, filed pursuant to Federal Rule of Civil Procedure 52(a).

# FINDINGS OF FACT

1. On July 1, 1988, National Life issued a life insurance policy, No. 2090868, to John M. Ward ("Ward"). The annual premium was $9,499.98, and the amount of the policy was $403,321. P.Ex. 4-A.[1]

2. On February 8, 1989, National Life issued a life insurance policy, No. VL0029793, to Daniel M. Edgar ("Edgar"). The annual premium was $5,000, and the amount of the policy was $257,946. P.Ex. 4-B.

3. On February 10, 1989, National Life issued a life insurance policy, No. 2102499, to Edgar. The annual premium was $11,855.47, and the amount issued was $770,891. P.Ex. 4-C.

4. Each of the policies provided for the accrual of cash value as the annual premiums were paid. All of the policies also provide for the net cash value to be paid to the owner of the policy should the policy be surrendered prior to the owner's death. P.Exs. 4-A, B, C.

5. Policies No. 2090868 and No. 210499 define net cash value as:

> The Net Cash Value is: 1. the Cash Value; plus 2. any remaining dividends held; plus 3. the value of any dividend additions in force; less 4. any debt to us on this policy.

Policy No. VL0029793 contains a definition of net cash value that is substantially similar. P.Exs. 4-A, B, C.

---

[1] A reference to P.Ex. followed by a number or numbers refers to one of plaintiff's exhibits.

6. On September 5, 1989, Edgar entered into two split dollar agreements with his employer at that time, Cape Coral Medical Center of Cape Coral, Florida ("Cape Coral"). Pursuant to the agreements, Cape Coral agreed to pay the premiums on Edgar's two life insurance policies in exchange for Edgar assigning the policies to Cape Coral. Each of the split dollar agreements referenced that the employee, Edgar, would execute "a collateral assignment of the policy to the Company [Cape Coral] on the collateral assignment form attached to this agreement." P.Exs. 1-B, C.

7. On September 5, 1989, Edgar executed both collateral assignment forms regarding his life insurance policies. P.Exs. 2-B, C. The assignment for policy No. 0029793, P.Ex. 2-B shows it was recorded by National Life on August 7, 1990. The assignment for policy No. 2102499 bears no recording stamp, but presumably it was recorded at the same time.

8. On April 20, 1993,[2] Ward entered into a split dollar agreement with his employer at the time, Cape Coral. Pursuant to the agreement, Cape Coral agreed to pay the premium on Ward's life insurance policy in exchange for Ward assigning the policy to Cape Coral. The split dollar agreement referenced that Ward would execute "a collateral assignment of the policy to the Company on the collateral assignment form attached to this agreement." P.Ex. 1-A.

---

[2] The split dollar agreement is dated April 21, 1993, while the collateral assignment is dated April 20, 1993. The date difference is immaterial.

9. On April 20, 1993, Ward executed the collateral assignment form regarding his life insurance policy. P.Ex. 2-A. The document shows that it was recorded by National Life on July 23, 1993.

10. All three of the assignment forms contain language indicating that they are "subject to all the terms and conditions of the Policy." For example, the Ward assignment form shows that Ward assigned to Cape Coral his life insurance policy No. 2090868 " as collateral security for the interest of [Cape Coral] arising under the terms of the split dollar agreement between [Ward] and [Cape Coral] dated April 20, 1993 **subject to all the terms and conditions of the Policy** and to all superior liens, if any, which the Insurer (National Life) may have against the [P]olicy." P.Ex. 2-A (emphasis added).

11. In 1995, Ward, Edgar, and Cape Coral stopped paying the annual premiums on the life insurance policies, but the policies were not surrendered for their cash value. P.Exs. 5-A, B, C. There is no direct proof in the record explaining why they stopped paying the premiums. However, Ward, who testified at trial, was sentenced in 2000 in federal court for converting over $1 million in Cape Coral funds to his own use, with the transactions ending in 1994. D.Ex. 1.[3] On cross examination, defense counsel brought out that Ward used the stolen funds in part to pay for the premiums on the insurance policies that benefitted him. Although Ward denied on cross examination that he stole from Cape Coral, the Eleventh

---

[3] A reference to D.Ex. followed by a number or numbers refers to one of defendant's exhibits.

Circuit Court of Appeals confirmed his conviction.[4] This circumstance likely accounts for the cessation in the payment of the annual premiums for the life insurance policies.

12. National Life maintained the policies by funding the premium payments with loans from the policies. Such loans were authorized under the terms of each of the policies. P.Exs. 4-A, B, C; 5-A, B, C.

13. On April 7, 2005, Cape Coral transferred to Woodruff its interests in all three of the life insurance policies. P.Exs. 6-A, B.

14. In 2005, Woodruff surrendered the policies to National Life for payment of their cash values, and National Life paid Woodruff. In calculating the surrender cash value payments owed to him, National Life deducted the principal and interest owed on the premium loans made to maintain the policies from 1995 to 2005. P.Exs. 7-A, B, C.

15. Woodruff objects to the surrender cash values he received on the policies contending that National Life's deduction of loan amounts and interest after a certain point violated the split dollar agreements and/or the terms of the life insurance policies.

16. Ward testified that the split dollar agreements and collateral forms were provided by Mr. Sousa and Mr. Calcateria of Life Planning Associates who were acting as agents of National Life. In responses to requests to admit that are in the record, National Life denied that the split dollar agreements were drafted by National Life. There is no competent proof

---

[4] *See United States v. Edgar*, 304 F.3d 1320 (11th Cir. 2002). The court notes that the other defendant in the case was Daniel M. Edgar, the owner of the other two life insurance policies at issue in this case.

that National Life created or participated in the creation of the split dollar agreements or the collateral agreements attached to them. Even if it did, National Life is not a party to any of the agreements, and it did not participate in their execution.

17. Woodruff does not dispute that National Life could make policy loans to pay the premiums on the life insurance policies that were not being paid by Cape Coral, Edgar, and Ward. Pursuant to policy Nos. 2090868 and 2102499, the amount of a policy loan cannot exceed loan value. Loan value is the amount with interest that equals the cash value. As set out above, net cash value includes a deduction for "any debt to us on this policy." These policies also contain the following language under the section entitled **"General Loan Terms"**:

> The debt secured by this policy includes loans, unpaid loan interest and accrued loan interest not otherwise due. All or any part of the debt may be paid at any time prior to: 1. the death of the Insured; and 2. default in payment of any premium unless the policy is in force as paid up life insurance; and 3. surrender of the policy while in force as paid up life insurance. When any of these events occurs, all debt shall become due at once. It shall then be paid from the policy values.

P.Ex. 4-A, C. [5]

18. The policy language does not encompass claims or "debt" other than what would be owed directly to National Life on the policy. The "any debt to us on this policy" language in the net cash value definition sets that limitation.

---

[5] Policy No. VL0029793, P.Ex. 4-B, contains substantially the same language.

19. The split dollar agreements incorporated certain terms of the policies as follows:

> Upon surrender of this policy or upon termination of this agreement prior to the death of the Insured, [Cape Coral] shall be entitled to an amount equal to the lesser of (A) or (B) below: (A) The cash value of the policy as of the next succeeding policy anniversary, including the cash value on such anniversary of all dividend additions purchased with the dividends payable through the preceding policy anniversary, plus any final and terminal dividend and refund of premium payable by National, decreased by any indebtedness incurred by [Cape Coral] against the policy. (B) The sum of its net contributions under this agreement.

P.Exs. 1-A, B, C.

20. The split dollar agreements define cash value as follows:

> "Cash Value" – The cash surrender value **as defined in the policy**, including the cash value of any paid-up additional insurance.

P.Exs. 1-A, B, C (emphasis added).

20. The assigned interests of Cape Coral were not debts to National Life on the policies that impaired the net cash value.

21. Woodruff testified that the policy files indicate that no notices were sent indicating that claims exceeded the value of the polices. Ward testified that he did not receive notice that the value of the polices was insufficient to pay the annual premiums. However, the court finds that there was no basis for National Life to send notice to the owners pursuant to the

language of the policies.[6]

**CONCLUSIONS OF LAW**

The court will address the issues identified in the parties' pretrial order [doc. 39]. At the pretrial conference, it was decided that Tennessee law would be applied in this case.

1. <u>Whether plaintiff has standing to assert claims for damages allegedly incurred by Cape Coral Medical Center?</u>

National Life presented no proof and made no argument at trial regarding this issue. On that basis, the court would conclude that National Life has waived the issue. However, in any event, Woodruff does have standing to assert a claim regarding what he received from National Life when he surrendered the policies. *See Alston v. Advanced Brands & Importing Co.*, 494 F.3d 562, 564 (6th Cir. 2007) ("The irreducible constitutional minimum of standing comprises three requirements: injury in fact, causation, and redressability.") (internal quotation marks and citation omitted). National Life recognized Woodruff's assigned interest in the policies, allowed him to surrender them, and paid him its calculation of the surrender cash value. On that basis, Woodruff has standing.

---

[6] The court observes that at some point both Edgar and Ward were in federal custody. In 2000, Ward was sentenced to 60 months and 87 months in federal prisons, both sentences to run concurrently.

8

2. and 3. <u>Whether National Life had a duty to administer the policies in accordance with the terms of the split dollar agreements and if so, whether National Life violated the terms of the split dollar agreements and collateral assignments in its calculations of the cash surrender value payable to Cape Coral Medical Center</u>?

Both of these issues can be addressed together. The split dollar agreements and the collateral assignments were contracts that were entered into by Ward and Edgar with their employer at the time Cape Coral. National Life was not a party to those agreements; it was not a beneficiary of those agreements; and it had no obligations under those agreements. The life insurance policies that had been purchased prior to the execution of the split dollar agreements are referenced and are incorporated in part into the split dollar agreements, but they are not controlled by or subject to the terms of the split dollar agreements. The split dollar agreements incorporate the definition of cash surrender value from the policies and the collateral assignments specifically reference the agreements being "subject to all the terms and conditions of the Policy." The split dollar agreements were side contracts that Ward, Edgar, and Cape Coral entered into regarding how the annual premiums on the life insurance policies would be paid. The agreements were theirs not National Life's, and there is no basis to find that National Life potentially could or did breach those split dollar agreements on any basis.

There is also no basis for National Life to have considered or included Cape Coral's and subsequently Woodruff's claim under the split dollar agreements as a claim or "debt" against the policy. The policies include in the definition of net cash value "any debt

to us on this policy." There is also no language under the policies definitions of policy loan, loan value, or debt that could conceivably encompass outside claims or "debt" against the policy as asserted by Woodruff. Thus, there is no showing that the policy debt equaled or exceed the loan value triggering any notice requirement. Therefore, there is also no showing that National Life improperly calculated the surrender cash value of the three policies when it subtracted the loan and loan interest amounts from the cash value and dividends on each policy surrendered by Woodruff.

4. If National Life breached the terms of the split dollar agreements or collateral assignments, plaintiff is entitled to punitive damages?

Because the court finds that plaintiff is not entitled to recover from National Life, the issue of punitive damages does not need to be addressed. However, even if the court were to find in favor of Woodruff, this is not an appropriate case for punitive damages. "[A]s a general rule punitive damages are not proper in breach of contract cases. There are exceptions, however, in cases involving fraud, malice, gross negligence or oppression." *Medley v. A.W. Chesterton Co.*, 912 S.W.2d 748, 753 (Tenn. Ct. App. 1995) (internal quotation marks and citations omitted); *see also Owens Transp. Co. v. Owens Drive-A-Way, Inc.*, No. 03A01-9307-CH-00240, 1994 WL 142588, at *3 (Tenn. Ct. App. Apr. 22, 1994) ("[T]he Tennessee Supreme Court has held for many, many years that punitive damages are not available for breach of contract actions. However, they are available when fraud, malice, gross negligence or oppression intervenes in any kind of action."). This case did not

involved fraud, malice, gross negligence, or oppression.

An order reflecting this opinion will be entered.


ENTER:


<u>      s/ Leon Jordan      </u>
United States District Judge